UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SCOTT A. SYMES,<br><br>Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration;<br><br>Defendant. | 4:14-CV-04127-KES<br><br>MEMORANDUM OPINION AND ORDER AFFIRMING THE DECISION OF COMMISSIONER |

Plaintiff, Scott A. Symes, seeks review of the decision of the Commissioner of the Social Security Administration denying his claim for social security disability insurance (SSDI) under Title II of the Social Security Act, 42 U.S.C. § 423, and supplemental security income (SSI) under Title XVI of that Act, 42 U.S.C. § 1382. The Commissioner opposes the motion and moves the court to affirm the denial. For the following reasons, the court affirms the decision of the Commissioner.

**PROCEDURAL HISTORY**

Symes applied for SSDI and SSI on August 25, 2011, alleging disability since June 30, 2008, due to several mental conditions, back problems, and a knee injury. AR 94, 220, 260.[1] Symes previously applied for SSDI and SSI and

---

[1] All citations to "AR" refer to the appropriate page of the administrative record.

an Administrative Law Judge (ALJ) denied his request on June 29, 2011. AR 72-88. Symes did not appeal this decision and it became final; thus, the alleged onset date of his disability for this claim is June 30, 2011. 20 C.F.R. §§ 404.955, 404.957(c)(1); *see Rogers v. Chater*, 118 F.3d 600, 601 (8th Cir. 1997) (noting a claimant generally cannot seek benefits in a subsequent proceeding for any time period for which the prior proceeding had denied benefits). Symes's insured status for Title II benefits expired on September 30, 2011.[2] Thus, the relevant time period for Symes's Title II claim is the three months from June 30, 2011, through September 30, 2011. And the relevant time period for Symes's Title XVI claim is from June 30, 2011, through March 5, 2013.

The Social Security Administration (SSA) initially denied Symes's current application on January 20, 2012, and again upon reconsideration on May 4, 2012. AR 154, 167. Symes then requested an administrative hearing and appeared with counsel before ALJ Denzel R. Busick on February 11, 2013. *See* AR 26-68 (transcript of hearing). On March 5, 2013, the ALJ issued an unfavorable decision finding that Symes retained the residual functional capacity (RFC) to perform light work within certain parameters. AR 16. The ALJ denied Symes's claims, concluding a significant number of jobs existed that Symes could perform. AR 20-21. Symes timely filed a request for review by the

---

[2] To receive Title II benefits, a claimant must prove disability on or before the date insured status expires. *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998).

Appeals Council, which was denied on June 20, 2014.[3] AR 1-2. On August 13,

2014, Symes commenced this action seeking judicial review of the

Commissioner's denial of his claims. Docket 1. After briefing was complete, the

Commissioner moved to file a supplemental administrative record. Docket 13.

Symes opposes the motion. Docket 16 (Symes's response to Commissioner's

motion); Docket 15 (supplemental record received).[4]

## FACTUAL BACKGROUND

Symes was born on February 29, 1980. He was 33 years old at the time

of the Commissioner's final decision on March 5, 2013. AR 124. Symes

attended school through the eleventh grade. AR 31, 124. He has past relevant

work experience as a supervisor, stock clerk, pizza baker, construction worker,

food sales clerk, and kitchen helper. AR 271-77, 303.

## I. Mental Impairments

The earliest records of Symes's mental impairments date back to

November 2008. As part of his prior disability application, Symes completed an

---

[3] Because the Appeals Council denied Symes's request for review, the ALJ's decision represents the final decision of the Commissioner for purposes of judicial review. 42 U.S.C. § 405(g).

[4] The court will allow the Commissioner to file the supplemental record so the court may have the benefit of seeing the information which Symes claimed the ALJ improperly omitted. Without access to the supplemental transcript, the court would be unable to evaluate Symes's argument except by speculating on what those records may have contained. The court is only granting permission to *file* the supplemental record; it is not ruling that the information therein was properly considered by the ALJ. The court sees no prejudice to Symes by allowing the Commissioner to provide the court with information which Symes himself placed in issue. The motion to supplement the record (Docket 13) is granted.

interview with psychologist Dr. Elwin Unruh on November 13, 2008.[5] AR 306-19. Dr. Unruh described Symes as "generally quite upbeat and responsive," with no indication of any delusions or hallucinations. AR 307-08. He found that Symes was of average intelligence, with an IQ of 93, but that academically Symes operated significantly below average. AR 309. Dr. Unruh diagnosed Symes with bipolar disorder, a learning disability, and attention deficit/hyperactivity disorder (ADHD). AR 309.

On April 18, 2011, Symes met with Dr. Melissa Spanggaard at Southeastern Behavioral HealthCare. AR 347-49. Symes reported feeling anxious about his upcoming disability hearing, and stated that he had not been applying for any jobs due to the upcoming hearing. AR 347-48. Dr. Spanggaard described Symes's mood as euthymic,[6] pleasant, and cooperative, with linear and goal-directed thought production. AR 348. Dr. Spanggaard noted that Symes exhibited fair attention, concentration, insight, and judgment, and diagnosed him with obsessive-compulsive disorder (OCD), intermittent explosive disorder, marijuana dependence in remission, nicotine dependence, and methamphetamine dependence in full sustained remission. AR 348. She also assessed personality disorder, not otherwise specified, and diagnosed a current global assessment of functioning (GAF) of

---

[5] Dr. Elwin Unruh is a psychologist and is not to be confused with the below-referenced chiropractor Nathan Unruh.

[6] Euthymia is "a pleasant relaxed state of tranquility; stable mood." *Medical Dictionary*, The Free Dictionary, http://medical-dictionary.thefreedictionary.com/euthymia (last visited June 12, 2015).

60.[7] AR 348. Dr. William Fuller supervised the interview and concurred with Dr. Spanggaard's diagnosis and treatment. AR 349. Dr. Fuller noted Symes's rapid speech and high energy levels during the interview. AR 349.

In April 2011, Symes also began receiving therapy from counselors at Southeastern Behavioral. AR 378. On April 20, 2011, Symes told his counselor that he was unsure about working with Employment Connection Services because finding employment would mean he would have to pay more for rent and utilities and would decrease his food stamps. AR 375. On May 6, 2011, his counselor indicated that Symes's mood and thoughts seemed to be within normal limits, and his dress and hygiene were "good." AR 371. Symes continued meeting with a counselor about once a month through 2011. AR 351-73, 393-414. The counselor consistently described Symes's mood and thought process as "appropriate." *See, e.g.*, AR 353, 355, 361, 394, 401. On July 20, 2011, Symes told his counselor "he has been sleeping more during the day and staying up all night . . . playing games and hanging out with friends." AR 361.

---

[7] The GAF is a numeric scale (1 through 100) used by mental health clinicians to subjectively rate the social, occupational, and psychological functioning of adults. *See Guidelines for Rating Global Assessment of Functioning*, National Center for Biotechnology Information, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3036670/ (last visited June 9, 2015). A score of 51 to 60 indicates moderate symptoms or moderate difficulty in social functioning. A score of 61 to 70 indicates some mild symptoms but generally functioning pretty well with some meaningful interpersonal relationships. GAF Scale From DSM-IV-TR, https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf (last visited June 9, 2015).

Dr. Chad Erickson,[8] another doctor at Southeastern Behavioral, evaluated Symes on August 1, 2011. Dr. Erickson noted Symes's good grooming and hygiene, good mood, linear and goal-directed thought production, good insight, and fair judgment. AR 344. Symes reported smoking marijuana "on occasion," said that things were "going fairly well," and denied any OCD symptoms. AR 344. Dr. Fuller supervised the interview and concurred with Dr. Erickson's analysis, noting that the "patient's mental status findings were those of a pleasant and cooperative male who is appropriately dressed and easy to relate to. Mood is euthymic and actually quite positive and energetic." AR 345. Dr. Erickson saw Symes for a follow-up appointment on September 12, 2011. AR 341. Symes stated that he had low energy and low motivation, but otherwise felt that he was doing "fairly well" and believed that his OCD symptoms were under "fairly good control." AR 341. He reported continuing to use marijuana on occasion. AR 341. Dr. Erickson noted Symes's good grooming and hygiene, and prescribed Provigil to help with the daytime drowsiness.[9] AR 342. Dr. Fuller again concurred with Dr. Erickson's analysis. AR 342. On October 3, 2011, Dr. Erickson noted that Symes had discontinued taking Wellbutrin and still had low energy, but things were "going pretty good for the most part" and that Symes's OCD symptoms were under control. AR 390. Dr. Fuller again concurred. AR 391.

---

[8] Dr. Chad Erickson is not to be confused with below-referenced state expert Dr. Gregory Erickson.

[9] Provigil is a medication that promotes wakefulness and is used to treat excessive sleepiness. *See* Drugs.com, http://www.drugs.com/provigil.html (last visited June 12, 2015).

6

On November 14, 2011, Symes met with Dr. Erickson and stated that he "feels that things have been going quite well for him." AR 388. He stated that he had much higher energy levels during the day. AR 388. Dr. Erickson noted that he exhibited good grooming and hygiene, he seemed cooperative, friendly, and alert, and showed good insight and judgment. AR 388. Dr. Erickson wrote that Symes's OCD was "well controlled." AR 388. Dr. Fuller supervised and concurred, noting that Symes's mental status findings were "relatively negative." AR 389.

On January 5, 2012, Dr. Brian Kidman completed a physical consultation evaluation in conjunction with Symes's disability application. AR 380-83. Although the evaluation focused on Symes's physical ailments, Dr. Kidman noted that Symes appeared "euthymic and upbeat." AR 382. On March 5, 2012, Dr. Erickson followed up with Symes at Southeastern Behavioral. Symes stated that things were going "fairly well," he was working odd jobs with his father, and denied any problems with depression, sadness, anxiousness, or suicidal tendencies. AR 386. Symes expressed some frustration with his recent weight gain. AR 386. Dr. Fuller supervised and noted that Symes's mental status findings and appearance were within normal limits. AR 387. On June 4, 2012, Symes told Dr. Erickson that he discontinued Fluvoxamine[10] because the state stopped paying for it, and overall he felt "more

---

[10] Fluvoxamine is used to treat obsessive-compulsive disorder. *See* Drugs.com, http://www.drugs.com/pro/fluvoxamine.html (last visited June 15, 2015).

irritable and a bit more anxious." AR 520. Dr. Erickson prescribed Viibryd,[11] and noted that Symes was cooperative and alert, with linear and goal-directed thought production, good insight, and good judgment. AR 520-21. Dr. Erickson further noted that Symes's OCD was "well controlled." AR 521. Dr. Fuller supervised and concurred. AR 521.

Dr. Jessica McIlrath, another doctor at Southeastern Behavioral, saw Symes on July 30, 2012. Symes stated that he started taking Prozac in place of Viibrid, and the Prozac was working well. AR 517. Symes reported that he had been having some angry outbursts, but was in anger management. AR 517. He also reported obsessive behavior such as checking locks and windows and fixating on noises outside of his residence. AR 517. He described "manic" episodes where he became irritable and angry, and Dr. McIlrath discussed how these episodes do not sound like mania in the traditional sense. AR 518. He also stated that he continued to use marijuana, but claimed to be attempting to reduce his usage. AR 517. Dr. McIlrath questioned whether Symes's prior diagnosis of bipolar disorder was given while he was actively abusing methamphetamines in the past.[12] AR 518. She described Symes as "grandiose," but "pleasant and cooperative" with coherent, logical, and goal-directed thoughts, and assigned him a GAF score of 60. AR 518. Dr. Fuller concurred,

---

[11] Viibryd is an antidepressant. *See* Drugs.com, http://www.drugs.com/search.php?searchterm=viibryd (last visited June 12, 2015).

[12] Symes reported in his 2011 assessment with South Dakota Human Services that he used meth "almost every day, one line every hour" between ages 21 and 22, but stated that his last use was in 2006. AR 328.

stating that Symes "was smiling and joking" and appeared articulate. AR 519.
On September 17, 2012, Dr. McIlrath examined Symes. AR 515. Symes
reported that a female friend was staying with him, and her behavior was
causing him frustration. AR 514. He admitted to using marijuana more
frequently, and was experiencing some "vague suicidal and homicidal
thoughts" with no intent to carry through with anything. AR 514-15.
Dr. McIlrath noted that Symes appeared anxious, irritable, "a bit unstable,"
and "somewhat dramatic," but clear and alert. AR 516. Dr. Fuller concurred.
AR 516.

On September 30, 2012, Symes was admitted to Avera McKennan
Hospital after overdosing on Provigil and Trazodone. AR 467. Dr. Heather
Chester-Adam evaluated Symes on October 1, 2012, and noted poor
concentration, judgment, and insight, but a cooperative, pleasant, and
euthymic attitude. AR 440. Symes was admitted to inpatient treatment through
South Dakota Human Services Center on October 1, 2012. AR 450. Inpatient
records noted that Symes "was pleasant with staff and peers" and denied
suicidal thoughts. AR 497-99. Symes was discharged on October 12, 2012. AR
508. On the date of his discharge, Cynthia Jensen, M.Ed., noted that Symes
"had been attending groups and participating with them. He denied feeling
depressed or suicidal . . . [he] expressed feeling hopeful that he will continue to
feel good upon discharge." AR 509-09. Symes was prescribed an increased dose
of Prozac upon discharge and assigned a GAF score of 60. AR 511.

9

On November 19, 2012, Dr. McIlrath followed up with Symes at Southeastern. AR 511. Symes reported feeling "jittery all the time" since being discharged from the South Dakota Human Services Center, but also complained of "extreme amotivation and fatigue." AR 511. Symes discussed at length his position on medical marijuana and his use of marijuana to "self-medicate." AR 511. Dr. McIlrath noted that Symes's amotivation and fatigue would likely be worsened by smoking marijuana. AR 511. Dr. McIlrath described Symes's mood during the interview as calm and neutral, his speech as clear, spontaneous, and non-pressured, his judgment and insight as "marginal," and his thoughts as logical, coherent, goal-directed, and less dramatic than during his previous visit. AR 512. She noted that Symes denied any suicidal or homicidal ideation. AR 512. Dr. Fuller supervised and concurred with Dr. McIlrath's findings. AR 513. He noted that "the patient's mental status findings were those of a well-groomed Caucasian male, slightly animated and anxious at times but overall reasonable [sic] competent." AR 513.

## II.     Back and Knee Pain

Symes visited Dr. Nathan Unruh, D.C.,[13] at Envive for chiropractic care on April 4, 2011, May 4, 2011, and August 1, 2011. AR 337-40. On April 4, 2011, Symes described severe pain in his lower back, neck, and middle back. AR 337. He reported an increase in pain with transition from one position to another, and a decrease in pain with stretches, treatments, and ice. AR 337. Dr. Unruh assessed segmental dysfunction of the cervical, thoracic, lumbar,

---

[13] Dr. Nathan Unruh is a chiropractor and is not to be confused with the above-mentioned Dr. Elwin Unruh, psychologist.

and pelvic region, and assessed Symes's prognosis as fair. AR 337. On May 4, 2011, Symes reported dull, constant cervical, lumbar, and thoracic discomfort. AR 338. He described the pain as mild to moderate. AR 338. Dr. Unruh prescribed ice in the case of inflammation. AR 338. On August 1, 2011, Symes again complained of constant, dull cervical, lumbar, and thoracic discomfort, and stated that the pain was mild to moderate. AR 338. Symes reported that his daily activities affected his back pain. AR 338. Dr. Unruh performed chiropractic manipulative therapy to the sacroiliac joints, thoracic spine, and cervical and lumbar areas. AR 338.

On January 5, 2012, Dr. Brian Kidman performed a consultative evaluation for Symes's disability application. AR 380-383. Symes alleged back pain, fused vertebrae scoliosis, degenerative disc disease, left knee injury, and acid reflux disease as physical bases for disability. AR 380. Symes described lower back pain shooting into the upper back when he stoops, twists, or bends over. AR 380. He claimed that he could not sit for more than one hour, lie down for more than 15 minutes, stand for more than half an hour, walk for more than a block or 5 minutes, or lift more than 40 pounds without experiencing back pain. AR 380-81. Symes stated that ice and chiropractic treatment temporarily relieve the pain, but housework, repetitive motions, sitting, or standing for too long cause him greater pain. AR 381. He listed the pain as a 4 or 5 out of 10. AR 381.

Symes reported to Dr. Kidman that he had knee surgery on his left knee at age 18 for patellar dislocation. AR 381. He stated that since then, he has

experienced burning pain in that knee when standing for more than two hours. AR 381. He stated that he did not have any knee pain when sitting, but could not walk for more than 5 or 10 minutes before experiencing burning pain. AR 381. He stated that kneeling was very painful, and he could not stoop or bend more than a couple times in an hour before experiencing pain in the knee. AR 381. Symes reported that his acid reflux disease sometimes burns and gags him and gives him hiccups, but "this is the least of his problems." AR 381. Dr. Kidman took x-rays of Symes's back and knee and described the results as generally unremarkable, other than the x-rays of the lumbosacral spine, which showed severe scoliosis and apparent fusion of the L4-5 vertebrae. AR 383.

On August 15, 2012, Dr. Erik Jacobson evaluated Symes for a general health physical and STD check at the Avera McKennan Downtown Clinic. AR 525. Symes reported stable chronic back pain. AR 525. Dr. Jacobson found him to be in good physical health with no acute findings. AR 525.

## ALJ DECISION

On March 5, 2013, the ALJ issued a decision denying Symes's application for benefits. AR 12-21. In doing so, the ALJ used the sequential five-step evaluation process.[14] At step one, the ALJ determined that Symes had

---

[14] An ALJ must follow " 'the familiar five-step process' " to determine whether an individual is disabled. *Martise v. Astrue*, 641 F.3d 909, 921 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)). 20 C.F.R. § 404.1520(a)(4)(i)-(v) provides that "(i) [a]t the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . . (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement of § 404.1509, or a combination of impairments that is severe and

12

not engaged in substantial gainful activity since June 30, 2011, the alleged
onset date in accordance with Symes's first application for benefits that was
denied on June 29, 2011. AR 14. At step two, the ALJ found that Symes
suffered from severe impairments, namely obsessive compulsive disorder,
attention deficit disorder, antisocial personality disorder, status-post spinal
fusion, degenerative disc disease, left knee injury, and arm pain. AR 14. At step
three, the ALJ determined that Symes did not have an impairment or
combination of impairments that met or medically equaled a listed impairment.
AR 14-16. At step four, the ALJ determined that Symes had the RFC to perform
light work within certain parameters. AR 16. Based on this RFC determination,
the ALJ concluded that Symes could not perform any past relevant work. AR
19-20. At the fifth and final step, the ALJ considered testimony of a vocational
expert and determined that Symes was capable of performing other jobs that
existed in significant numbers in the national economy. AR 20-21. Accordingly,
the ALJ found that Symes was not disabled and thus did not qualify for
benefits under the Social Security Act. AR 21.

---

meets the duration requirement, we will find that you are not disabled. . . . (iii)
At the third step, we also consider the medical severity of your impairment(s). If
you have an impairment(s) that meets or equals one of our listings in appendix
1 of [subpart P of part 404 of this chapter] and meets the duration
requirement, we will find that you are disabled. . . . (iv) At the fourth step, we
consider our assessment of your residual functional capacity and your past
relevant work. If you can still do your past relevant work, we will find that you
are not disabled. . . . (v) At the fifth and last step, we consider our assessment
of your residual functional capacity and your age, education, and work
experience to see if you can make an adjustment to other work. If you can
make an adjustment to other work, we will find that you are not disabled. If
you cannot make an adjustment to other work, we will find that you are
disabled."

## STANDARD OF REVIEW

The court must uphold the ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)). The court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, the court may not reverse it merely because substantial evidence also exists in the record that would support a contrary position or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by substantial evidence in the record as a whole, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on

14

proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

### I.    Whether the ALJ Erred in Determining Symes's RFC

Before an ALJ moves to step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). A claimant's RFC "is the most [he] can still do [in a work setting] despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The RFC assessment is an indication of what the claimant can do on a "regular and continuing basis" given the claimant's limitations. 20 C.F.R. §§ 404.1545(b); 416.945(b). " 'The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.' " *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). The RFC must include the limitations from all medically determinable

15

impairments, regardless of whether they are considered severe. *See* SSR 96–8p, 1996 WL 374184 at *5 (SSA 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' ").

In determining Symes's RFC, the ALJ considered Symes's complaints of pain and limitations from OCD, attention deficit disorder, antisocial personality disorder, status-post spinal fusion, degenerative disc disease, left knee injury, and arm pain. AR 17-19. The ALJ made findings on Symes's credibility, and considered medical treatment records and opinions from Dr. Fuller, Dr. Kidman, and several state agency physicians. The ALJ ultimately determined Symes had the RFC to perform light work within the following parameters:

> He can lift and carry 20 to 25 pounds occasionally, but 10 to 15 pounds, or less, frequently. With normal work breaks, he can sit 6 hours as well as stand and walk, combined, 4 hours in an 8-hour workday, with a sit/stand option allowing some discretion to sit, stand, and move around in his assigned work area. He can occasionally climb stairs, slowly and with a handrail, but never climb ladders, ropes and scaffolds. He can balance frequently but crouch, kneel, stoop and crawl occasionally. He has no manipulation or visual limits. From a communication standpoint, he is limited in reading and writing, and not suitable for tasks involving correspondence or extensive written instructions. He must avoid concentrated exposure to work hazards, such as unprotected heights, fast and dangerous machinery. He has mild limitations in activities of daily living, with moderate limitations, at all times, in social functioning and mild up to moderate limits in concentration, persistence and pace. As used herein and defined for the vocational expert, the term "mild" means slightly affected, but not interfering with work activity, while the term "moderate" means affected, not precluded, such that a person is functioning at lower acceptable limits for most workplaces. As defined, the claimant is moderately limited, at all times, in interacting with the public and getting along with coworkers, as well as in accepting

16

instructions criticism from supervisors. Most of the time, he is
mildly limited in handling detailed instructions, maintaining
extended concentration and adapting to changes in a work routine
or setting. When perceiving himself under time pressure, he will
likely reach a moderate degree of limitation in the area of
concentration, persistence and pace. Thus, he is best suited for
work involving only brief and superficial contact with others, and
performing simple, routine and repetitive tasks of three to four
steps, on average.

AR 16.

### A.    Symes's Credibility

 "[W]hen evaluating a claimant's credibility, in addition to considering the

absence of objective medical evidence to support complaints of pain, an ALJ

should consider a claimant's reported daily activities, the duration, frequency

and intensity of his or her pain, precipitating and aggravating factors,

medication, and functional restrictions." *Steed v. Astrue*, 524 F.3d 872, 875 n.4

(8th Cir. 2008) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984));

*see* 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3). "Subjective complaints may be

discounted if there are inconsistencies in the evidence as a whole." *Polaski*, 739

F.2d at 1322. "The ALJ is not required to discuss methodically each *Polaski*

consideration, so long as [the ALJ] acknowledged and examined those

considerations before discounting [Symes's] subjective complaints." *Steed*, 524

F.3d at 876 (quotation omitted). An ALJ must make express credibility

determinations detailing reasons for discounting a claimant's subjective

complaints of pain. *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010). An

ALJ's credibility determination is entitled to deference because the ALJ is in a

better position than a reviewing court to gauge credibility. *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).

### i.    Allegations of Mental Limitations

On September 19, 2011, Symes completed a function report in conjunction with his disability application. AR 279-286. He stated that he needed encouragement to do housework because he would lose interest due to his ADHD. AR 281. He described feeling more anxious around others since his condition began, and experiencing difficulty dealing with authority figures. AR 284-85. He also described having trouble handling stress and changes in routine. AR 285. He stated that he struggles with short-term memory and concentration, but can easily pay attention with constant action. AR 284, 286. He described difficulty with lengthy written instructions and with any spoken instructions. AR 284.

In Dr. Kidman's January 2012 evaluation, Symes stated that he typically gets up at 1 in the afternoon and goes to bed at 4 in the morning. AR 382. His hobbies included talking to friends and playing video games, and he stated that he does watch TV and is able to follow the storyline. AR 382. He said that his family is "supportive," and that he is no less social than he used to be. AR 382.

Symes appeared in person for his disability hearing in front of the ALJ on February 11, 2013. AR 26-68. In his testimony, Symes alleged that he had problems with his temper, and he stated that his records with Southeastern Behavioral HealthCare reported verbally aggressive behavior. AR 40-41. He stated that he maintained few friendships. AR 43. He described having

18

difficulty with racing thoughts and obsessions. AR 41. He testified to having
trouble keeping focus and remembering things, and he stated he sometimes
loses his train of thought in the middle of a sentence. AR 44-46. He described
his use of marijuana to self-medicate and stated that his prescribed
medications make him groggy during the day. AR 50-51, 53.

### ii.   Allegations of Physical Limitations

In Symes's disability function report, he described a typical day in which
he does back stretches, loads the dishwasher, does a load of laundry, rides his
bike to the store, fixes lunch, watches a movie, and stays up until about 3 a.m.
AR 279. He alleged that most of those activities make his back hurt. AR 279.
He stated that since his back started hurting, he cannot dress or bathe himself
without pain, and it is difficult for him to cook while standing. AR 279. He
further stated that his hobbies include hunting, camping, fishing, Frisbee golf,
"outdoors stuff," bowling, biking, hanging out with friends and some family, ice
skating, hockey, and games, but because of his back pain, he is limited to
playing games and hanging out with friends, and that he hunts with a four-
wheeler instead of on foot. AR 283.

In his evaluation with Dr. Kidman, Symes described his daily activities.
AR 382. He stated that he gets up at about 1 in the afternoon and goes to bed
at about 4 in the morning. AR 382. After waking up, he watches TV, stretches,
and does chores. AR 382. In the afternoon, he hangs out with friends, and in
the evening, he eats dinner, watches TV, and stretches. AR 382. He said he
could cook meals, vacuum, do laundry, and wash dishes, but stated that

chores and activities are difficult because of his pain and he has difficulty washing clothes, going up and down stairs, and washing dishes. AR 382. He stated he could complete all self-care activities. AR 382.

Symes was committed to South Dakota Human Services Center from October 1 to October 12, 2012, for inpatient treatment following his overdose. AR 450. Inpatient treatment records show that Symes stated he "enjoys bowling, camping, hunting, and fishing," as well as lifting weights, and "looks forward to hunting again soon." AR 499.

In his February 2013 testimony in front of the ALJ, Symes stated that he probably would not be able to stay on his feet for a full 8-hour day due to his back pain. AR 46-47. He stated that he could walk up to one and one-half blocks, probably could not be on his feet for 4 or 5 hours, and could only sit for an hour. AR 46, 54. He described problems kneeling, crouching, and standing up, and stated that he could lift 20 or 30 pounds occasionally. AR 47-48.

### iii.    ALJ's Conclusion

The ALJ found that "[Symes]'s medically determinable impairments could cause the alleged symptoms. However, his statements concerning the intensity persistence, and limiting effects of these symptoms are not entirely credible . . . [Symes]'s allegations lack credibility due to some inconsistences between the extent of those allegations and objective medical evidence. [Symes] does experience some level of pain and limitations, but only to the extent described in the RFC above." AR 19.

The ALJ first noted that Symes's activities of daily living were inconsistent with his allegations of disabling physical pain. AR 19 (referencing Symes's statements that he can do household chores, make meals, care for his pets, ride his bike, and hunt using a four-wheeler). Aside from completing activities of daily living (*see, e.g.*, AR 283, 382), Symes described a decrease in back pain with stretches, chiropractic treatment, and ice. AR 337. The ability to successfully control pain with treatment can be inconsistent with an allegation of disabling pain. *Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009). If an impairment can be controlled through treatment or medication, it cannot be considered disabling. *Id.* (citing *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997)). Additionally, Symes's allegations of disabling pain were inconsistent with Dr. Kidman's physical exam. Dr. Kidman's x-rays of the knee, thoracic spine, and cervical spine were generally "unremarkable," and the lumbosacral spine showed severe scoliosis. AR 383. Based on the x-rays, Dr. Kidman concluded that Symes could engage in work where he could sit or change positions. AR 383.

The ALJ then observed that Symes's activities of daily living conflicted with his allegations of disabling mental illness. AR 19 (referencing Symes's reports of enjoying playing video games, "which requires concentration," paying attention when there is constant action, and spending time with friends and family). Symes reported an ability to undertake a variety of daily activities with little evidence of mental restrictions (*see, e.g.*, AR 283, 382), and treatment notes from Southeastern Behavioral show that his behavioral symptoms were

controlled with medication. *See, e.g.*, AR 517 (Symes stated that Prozac was "working well"); AR 345, 387-88, 389-90, 521 (psychologists' treatment notes describing Symes's mental status as normal and his OCD as under control); *c.f. Moore*, 572 F.3d at 525. The ALJ concluded that Symes's subjective complaints did not warrant additional limitations beyond those established in the RFC. AR 19.

Symes argues that the ALJ did not provide a detailed analysis for each *Polaski* criteria, and instead erred by evaluating his credibility based on inconsistencies between selectively-chosen factors and the already-determined RFC. Docket 11 at 37-38. While the ALJ is not required to methodically discuss each *Polaski* factor, he considered Symes's reported daily activities, persistence, functional restrictions, and intensity in making the credibility finding. AR 19; *see Steed*, 524 F.3d at 876. Thus, the ALJ did not err in finding Symes incredible. *See Goff v. Barnhart*, 421 F.3d 785, 791-92 (8th Cir. 2005) (finding that ALJ did not err by not expressly discussing each *Polaski* factor because it still considered the factors before making a credibility finding). Furthermore, the issue before this court is not whether the ALJ's credibility finding is unassailable, but whether it is supported by substantial evidence. *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). Substantial evidence is less than a preponderance, and the court may not reverse merely because substantial evidence would also support the opposite conclusion the ALJ reached. *Pate-Fires v. Astrue*, 564 F.3d 935, 942

(8th Cir. 2009). Finally, the ALJ is in a better position than this court to consider Symes's credibility. *Travis*, 477 F.3d at 1042.

### B.    Medical Opinion Evidence

A treating physician's opinion on the nature and severity of the claimant's impairments is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "While a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the hearing examiner must evaluate the record as a whole." *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) (citations omitted) (discounting treating physician's opinion that plaintiff was completely disabled because opinion was inconsistent with the record as a whole and was not supported by any medical evidence). The ALJ will also consider opinions from non-examining sources. 20 C.F.R. §§ 404.1527(e); 416.927(e). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (citations omitted); *see Wagner v. Astrue*, 499 F.3d 842, 850 (8th Cir. 2007) (permitting ALJ to disregard treating physician's restrictive opinion because it was inconsistent with record as a whole and was not supported by medical evidence).

23

If a treating physician's opinion is not given controlling weight, the ALJ should consider several factors in weighing it and any other medical opinions in the record, such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion, and the specialization of the source. 20 C.F.R. §§ 404.1527(c); 416.927(c). The ALJ must always give good reasons for the weight afforded to a treating physician's evaluation. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

### i.    Mental Medical Opinion Evidence

### a.    Dr. William Fuller

Dr. Fuller is a treating psychologist. Medical records show that he supervised Symes's appointments at Southeastern Behavioral HealthCare and concurred with Drs. Spanggaard, Erickson, and McIlrath in their assessments. On January 14, 2013, Dr. Fuller filled out a check-mark mental residual functional capacity (MRFC) assessment for Symes's social security disability application. AR 539-41. Dr. Fuller stated that Symes had a number of moderate and marked limitations due to his OCD. AR 539-41. Dr. Fuller noted that Symes's "[s]evere OCD is incapacitating – he has been unable to find or keep jobs." AR 541.

### b.    Dr. Doug Soule and Dr. Richard Gunn

On January 18, 2012, state agency mental health expert Dr. Doug Soule reviewed Symes's medical records as part of his initial disability application. AR

104-06. He completed an MRFC assessment and opined that Symes was
unlimited or not significantly limited in ten work-related areas, was moderately
limited in six areas, and was not severely limited in any areas. AR 104-06.
Dr. Soule reported that Symes "can be expected to complete simple 1-3 step
instructions and sustain attention and concentration through an 8-hour work
day," and "would work best in an environment that involves little interaction
with the public." AR 105-06. On May 3, 2012, state agency mental health
expert Dr. Richard Gunn reviewed Symes's records as part of his application
for reconsideration. AR 133-35. Dr. Gunn agreed with Dr. Soule's comments
and findings from the initial MRFC. AR 133-35.

### c.    ALJ's Conclusion

Symes argues that the ALJ erred in only giving partial weight to
Dr. William Fuller's January 2013 MRFC assessment, did not provide good
reasons for not giving controlling weight, and failed to properly weigh the
opinion under the regulatory factors set forth in 20 C.F.R. §§ 404.1527(c);
416.927(c). Docket 11 at 25-27.

In giving partial weight to Dr. Fuller's MRFC, the ALJ explained that the
MRFC was inconsistent with the other doctors' treatment notes, which
Dr. Fuller himself agreed with. "While [Dr. Fuller] opined that the claimant had
no limitations with understanding, memory, and most social interaction/
adaptation, he overstated the claimant's restrictions with respect to carrying
out instruction and maintaining attention/concentration. This is not consistent
with the other doctors' treatment notes . . . ." AR 19. For example, Dr. Fuller

25

stated in the MRFC that Symes's "[s]evere OCD is incapacitating[.]" AR 541. By contrast, Drs. Spanggaard, Erickson, and McIlrath noted several times throughout 2011 and 2012 that Symes's OCD was under control, and Dr. Fuller noted concurrently that Symes's mental health findings were within normal limits. *See, e.g.*, AR 345, 387-88, 389-90, 521. In the MRFC, Dr. Fuller also stated that Symes possesses a markedly limited ability to carry out instructions and perform activities within a schedule because of his OCD. AR 539. Again, these assertions are inconsistent with the other doctors' notes indicating that Symes's OCD was under control. The ALJ's decision to give Dr. Fuller's MRFC partial weight is consistent with the Eighth Circuit's approach allowing the ALJ to disregard conclusions of a medical expert if such conclusions are inconsistent with the record as a whole. *See, e.g.*, *Pearsall*, 274 F.3d at 1219. Thus, substantial evidence supports the ALJ's decision to discount Dr. Fuller's MRFC.

Symes next argues that the ALJ failed to properly weigh Dr. Fuller's MRFC under the regulatory factors set forth in 20 C.F.R. §§ 404.1527(c); 416.927(c); Docket 11 at 27. The ALJ noted that Dr. Fuller had overseen evaluations performed by Dr. McIlrath, Dr. Erickson, and Dr. Spanggaard, and the ALJ's opinion discussed the numerous instances when Dr. Fuller confirmed their findings. AR 17-18. Comparatively, the ALJ acknowledged that Dr. Gunn was a non-examining physician who reviewed Symes's records. AR 19. Furthermore, the ALJ determined that Dr. Fuller's MRFC was neither consistent nor supported by either his own records or the record as a whole.

26

AR 19. By contrast, the ALJ determined Dr. Gunn's findings were consistent with and supported by the record. AR 19. Finally, Dr. Fuller's MRFC provided little context or reasoning for why he believed the limitations that he assigned to Symes were appropriate. The Eighth Circuit has explained that such evaluations do not carry much evidentiary value. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (agreeing "that a conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little to no elaboration.") (quotation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding the ALJ was correct to discount a treating physician's report which "consists of three checklist forms, cites no medical evidence, and provides little to no elaboration."). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3). By considering these factors, the ALJ did not fail to evaluate the MRFC under § 404.1527(c).

### ii.   Physical Medical Opinion Evidence

#### a.   Dr. Brian Kidman

Dr. Brian Kidman is a consulting physician. On January 5, 2012, Dr. Kidman completed a consultative physical exam as part of Symes's disability application. AR 380-383. Dr. Kidman found normal range of motion of the neck, limited range of motion of the thoracic and lumbosacral spine, normal knee flexion and extension, normal muscle strength, negative straight leg raise, and no significant issues with squatting, rising from the squat,

27

getting on and off the exam table, or getting in and out of the chair. AR 382-83. Knee x-rays were unremarkable, other than two screws in the proximal tibia. AR 383. X-rays of the cervical spine were unremarkable other than a straightening of the cervical curve, which Dr. Kidman concluded could cause chronic pain. AR 383. X-rays of the thoracic spine showed mild scoliosis but were otherwise unremarkable. AR 383. X-rays of the lumbosacral spine showed severe scoliosis and apparent fusion of the L4-5 vertebral bodies.  AR 383. Dr. Kidman concluded that Symes's back and knee pain could significantly hamper him from doing labor-related work, but "if he could be retrained, he may well do better being able to sit or change positions frequently." AR 383.

### b.    Dr. Kevin Whittle

As part of Symes's initial disability determination, state agency physician Dr. Kevin Whittle completed an opinion on January 18, 2012. AR 99-104. Dr. Whittle cited a medical source statement completed by chiropractor Dr. Nathan Unruh[15] on May 16, 2011. AR 99. Dr. Unruh's report described Symes's pain as dull, but sometimes moderate or severe, and noted reduced range of motion, tenderness, muscle spasms, and muscle weakness. AR 99. The report stated that Symes could be expected to sit for 30 minutes and stand for 30 minutes, take one or two unscheduled breaks a day, occasionally lift 20 pounds, and sit or stand and walk for at least 6 hours in an 8-hour work day. AR 99. Dr. Whittle also cited Dr. Kidman's January 5, 2012, evaluation. AR 99-

---

[15] Chiropractor Dr. Nathan Unruh is not to be confused with the above-mentioned psychologist Dr. Elwin Unruh.

100. Dr. Whittle gave Dr. Nathan Unruh's 2011 chiropractic evaluation great weight in determining a physical RFC. AR 103. The RFC stated that Symes could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand or walk up to 4 hours a day and sit for up to 6 hours a day with some postural limitations. AR 103-04.

### c.    Dr. Gregory Erickson

State agency physician Dr. Gregory Erickson[16] completed a physical RFC on May 3, 2012, for Symes's reconsideration determination. AR 133. In contrast with Dr. Whittle's initial opinion, Dr. Erickson gave Dr. Unruh's chiropractic evaluations little weight. AR 133. Dr. Erickson explained that "Dr. Unruh is a DC and is not a medically acceptable source. Dr. Unruh does not cite objective medical findings in support of the limitations stated in his opinion." AR 133. Dr. Erickson also discounted Dr. Kidman's evaluation because "his opinion overstates the claimant's limitations due to snap-shot estimate." AR 133. Accordingly, Dr. Erickson found no exertional or nonexertional limitations due to insufficient evidence. AR 133.

### d.    ALJ's Conclusion

Symes argues that the ALJ erred in evaluating Dr. Kidman's consultative evaluation.  While it is generally true that "[t]he opinion of a consulting physician who examines a claimant once . . . does not generally constitute substantial evidence," *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998), there are exceptions to this general rule. *Cantrell v. Apfel*, 231 F.3d 1104, 1107

---

[16] Dr. Gregory Erickson is not to be confused with the above-mentioned Southeastern Behavioral psychologist Dr. Chad Erickson.

(8th Cir. 2000). Where a consulting physician's opinion is consistent with the ALJ's RFC, and no medical evidence contradicts that opinion, the ALJ has an adequate medical basis for that RFC. *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (concluding that one consulting physician's RFC assessment supported the ALJ's RFC finding when none of the claimant's treating physicians opined she was unable to work).

The ALJ cited Dr. Kidman's treatment notes concerning Symes's physical ailments. AR 18. Dr. Kidman found that Symes experienced some limitations in his range of motion and had some tenderness in the neck and spine. AR 382-83. After reviewing the x-rays, Dr. Kidman concluded that Symes would be significantly hindered from doing labor-related work because of his knee and spine pain, and "may well do better being able to sit or change positions frequently." AR 383. The ALJ was justified in considering Dr. Kidman's treatment report because his conclusions were consistent with the record and were supported by medical evidence, namely the x-rays. *See Cantrell*, 231 F.3d at 1107. Furthermore, while the ALJ stated that Dr. Kidman's physical exam was "essentially normal," the ALJ then noted that Symes suffered "tenderness in his neck, lower back, and knee." AR 18. Additionally, the ALJ's RFC determination followed Dr. Kidman's recommended limitations. AR 16, 383. Dr. Kidman stated that Symes would be hindered from doing labor-related work, and the ALJ adopted that limitation by determining that Symes could only engage in light or sedentary work. AR 16, 20-21. Finally, although the ALJ did not discuss Dr. Kidman's x-rays, he cited Dr. Kidman's conclusions based

on those x-rays; regardless, the ALJ is not required to recite every piece of evidence. *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). Thus, substantial evidence indicates the ALJ properly evaluated Dr. Kidman's medical opinion.

### C.    Whether the ALJ Erred in Formulating the RFC

Symes argues that the ALJ's assessment of his mental limitations is at odds with the findings of the state agency physicians concerning his reading, writing, concentration, and instruction-following abilities. Additionally, Symes contends that the ALJ did not explain how the differences were ascertained. Docket 11 at 32. First, substantial evidence supports the ALJ's assessment of Symes's reading and writing limitations. *See, e.g.*, AR 309 (diagnosing Symes with a learning disability with specific difficulty in reading and spelling); AR 320 (noting Symes's trouble with reading comprehension). Second, the ALJ's determinations of Symes's mental limitations are consistent with Dr. Gunn's MRFC. The ALJ stated that Symes has "moderate limitations, at all times in social functioning" (AR 16), which is consistent with Dr. Gunn's conclusions that Symes has moderate difficulties in maintaining social functioning (AR 131) and a moderately limited ability to interact appropriately with the general public. AR 135.

Substantial evidence also supports the ALJ's assessment of Symes's ability to maintain concentration. The ALJ stated that Symes has "mild up to moderate limits in concentration, persistence and pace" (AR 16), consistent with Dr. Gunn's conclusion that Symes is not significantly limited in five areas and moderately limited in three areas relating to concentration and

persistence. AR 134. Dr. Gunn described moderate limitations in the ability to maintain attention and concentration for extended periods, but no significant limitations in the ability to sustain an ordinary routine without special supervision, make simple work-related decisions, work at a consistent pace, or perform activities within a schedule. AR 134. Symes stated in his function report that he has an unlimited ability to pay attention "with constant action" (AR 284), and reported to Dr. Kidman that he is able to follow the storyline when watching TV. AR 382. Symes's treating psychologists regularly described Symes's memory, focus and concentration as "good" or "fair." *See*, *e.g.*, AR 345, 348, 391. The ALJ also found that Symes's limitations increased when he perceived himself under time pressure. AR 16. This finding is consistent with evidence in the record showing Symes's difficulties in dealing with stress. *See*, *e.g.*, AR 285, 514-15. Thus, substantial evidence in the record as a whole supports the ALJ's conclusion.

Finally, Symes points out that while Dr. Gunn stated Symes "can be expected to complete simple 1-3 step instructions" (AR 134), the ALJ found Symes could "perform simple, routine and repetitive tasks of three to four steps, on average." AR 16. Dr. Gunn concluded that Symes is not significantly limited in his ability to remember locations and work-like procedures and understand, remember, and carry out very short and simple instructions, but moderately limited in understanding, remembering, and carrying out detailed instructions. AR 134. In his function report, Symes reported difficulty with lengthy written instructions, but stated that short instructions were "ok." AR

284. And Symes testified at his hearing that he had trouble remembering short instructions throughout the day. AR 44. But treatment notes from Southeastern Behavioral often described Symes's memory as "good," and attention and concentration as "good" or "fair." *See, e.g.*, AR 348, 391, 512, 515, 518. Furthermore, the ALJ's determination that Symes could perform three to four step tasks is consistent with Dr. Gunn's conclusion that Symes could engage in "simple" work. AR 16, 134. Specifically, the ALJ emphasized that Symes could perform "simple, routine, and repetitive" work. *See Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997) (holding that hypothetical including the "ability to do only simple routine repetitive work, which does not require close attention to detail" sufficiently describes deficiencies of concentration, persistence, or pace). Consistent with Symes's limitations, the ALJ specified that Symes is "not suitable for tasks involving . . . extensive written instructions." AR 16. Thus, the ALJ's conclusion is consistent with the record and supported by substantial evidence.

Symes next asserts that the ALJ's formulation of his physical limitations in the RFC are at odds with the findings of the state agency physicians. Docket 11 at 32. While Dr. Whittle said that Symes could lift 20 pounds occasionally and 10 pounds frequently (AR 103-04), the RFC states that Symes can lift 20 to 25 pounds occasionally and 10 to 15 pounds frequently. AR 16. Beyond Dr. Whittle's conclusion, the ALJ considered Symes's 2012 appointment with Dr. Kidman, where he claimed he could lift up to 40 pounds (AR 19, 381), and Symes's own subjective testimony in February 2013 where he stated he could

lift between 20 and 30 pounds occasionally. AR 48. The ALJ did not err in considering the record as a whole when determining that Symes could lift 20 to 25 pounds occasionally and 10 to 15 pounds frequently.

Second, Symes points out that while the ALJ included a sit/stand with some discretion option in the RFC, and said Symes could never climb ladders, ropes, and scaffolds (AR 16), Dr. Whittle said nothing about a sit/stand option of any kind, and said that Symes could occasionally climb ladders, ropes, and scaffolds. AR 103-05; Docket 11 at 32. Assuming Symes is correct and the ALJ simply included several more restrictive limitations, the effect of those additional limitations meant that Symes was considered able to perform less work, not more, and the ALJ nonetheless found that Symes was not disabled at step five in spite of those additional limitations. Had the ALJ adopted the less restrictive findings of the state agency examiners verbatim, the ALJ would have reached the same conclusion. Thus, the ALJ's error, if any, was harmless. *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("Even if the ALJ had not erred, there is no indication that the ALJ would have decided differently."); *see also Renstrom v. Astrue*, 680 F.3d 1057, 1068 (8th Cir. 2012); *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008).

Furthermore, the ALJ did rely on evidence in the record in order to make his findings. Regarding the sit/stand option, Dr. Kidman concluded that Symes could "do better being able to sit or change positions frequently." AR 383. Similarly, although the ALJ found Symes not entirely credible, the ALJ considered his subjective complaints about his own physical limitations. For

example, Symes stated at his hearing that while he probably could climb a ladder if he had to, he would not want to do it regularly, and climbing stairs made him "tired and achy." AR 47-48. In his disability appeals report, Symes stated that climbing stairs made his back hurt. AR 290. The ALJ was correct to consider these sources of evidence before condensing his ultimate findings into the RFC assessment. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004) (holding that the ALJ has the duty to fully develop the record).

## II.   Whether the Vocational Evidence Was Supported by Substantial Evidence

In step four, the ALJ determines if the claimant can do past relevant work by posing a hypothetical question to the vocational expert about whether a person with the physical and mental limitations imposed by the claimant's medical impairments can meet the demands of his or her past work. 20 C.F.R. § 404.1560(b)(2). "Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true, and capture the concrete consequences of those impairments." *Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 365 (8th Cir. 2007) (quotations and citations omitted) (finding that although hypothetical question did not expressly state claimant was functionally illiterate, ALJ captured practical consequences of claimant's low IQ by limiting her to simple work). "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quotation omitted).

The ALJ's hypothetical question reflected the RFC and specified that Symes needed a sit/stand option, was limited to brief, superficial contact with other people, and would be limited to performing simple, routine, repetitive tasks of about three to four steps. AR 16, 59-64. The vocational expert found that Symes could not perform past relevant work under his limitations. AR 64.

In the fifth and final step, the ALJ determines if the claimant can adjust to other work based on the availability of suitable jobs in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). Based on the hypothetical question, the vocational expert testified that a significant number of light, unskilled jobs were available that met Symes's requirements. AR 62-65. The vocational expert specified that Symes would be limited to unskilled work. AR 62.[17] Specifically, the vocational expert stated that a small products assembler, inspector/packager, and final assembler fit the requirements of the hypothetical. AR 62.

Symes argues that unexplained conflicts exist between the vocational expert's testimony and the Dictionary of Occupational Titles (DOT) definitions of each cited job. Docket 11 at 35. Additionally, Symes argues that the cited jobs require a higher reasoning level than his abilities under the RFC. *Id.* at 36. Symes also argues that none of the cited jobs allow a sit/stand option. *Id.*

---

[17] "Unskilled" is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a). A worker can learn an unskilled job in thirty days and "little specific vocational preparation and judgment are needed." *Id.* An unskilled worker deals primarily with objects, rather than people. *Id.*; *see* SSR 85-15, 1985 WL 56857, at *4.

36

The DOT classifies reasoning requirements for jobs on a six-level scale, one being the most basic. The Eighth Circuit has found that unskilled jobs with a reasoning level of three or lower are suitable for claimants limited to "simple, concrete instructions." *See Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (claimant could perform unskilled work with reasoning level of three, even though she was limited to following simple, concrete instructions); *Hillier*, 486 F.3d at 367 (vocational expert's opinion that claimant who was limited to following simple, concrete instructions could work as cashier was not inconsistent with DOT description of cashier as requiring level three reasoning). Level one reasoning may require "commonsense understanding to carry out simple one- or two-step instructions [and d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." OALJ Law Library, Dictionary of Occupational Titles, Appendix C, http://www.lb7.uscourts.gov/documents/ILCD/093087.pdf (last visited June 9, 2015). Level two reasoning may require "commonsense understanding to carry out detailed but uninvolved written or oral instructions [and d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* Nevertheless, the DOT definitions "are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) (citations omitted). "Not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." *Id.*

37

The three jobs that the vocational expert identified are unskilled
positions. A small products assembler has a reasoning level of two under the
DOT definition.[18] An inspector/packager has a reasoning level of two.[19] A final
assembler has a reasoning level of one.[20] Consistent with the Eighth Circuit's
approach that positions at reasoning level three or lower are suitable for
claimants limited to following simple, concrete instructions, substantial
evidence supports the vocational expert's assertion that Symes would be able
to perform to the level required by the identified jobs.

Symes further argues that the DOT definitions do not provide a sit/stand
option. The vocational expert clarified, based on his experience, that the
identified positions do provide a sit/stand option. AR 64-65. "SSR 00-4p
specifically provides that, in crediting [vocational expert] testimony over a DOT
listing, an ALJ may rely on information about a particular job's requirements
. . . available in other reliable publications, information obtained directly from
employers, or from a [vocational expert]'s . . . experience in job placement or
career counseling." *Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014)
(quotations omitted). "Whether 'the [vocational expert]'s explanations were

---

[18] OALJ Law Library, Dictionary of Occupational Titles,
http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT07A.HTM (last
visited June 9, 2015).

[19] OALJ Law Library, Dictionary of Occupational Titles,
http://www.oalj.dol.gov/ PUBLIC/DOT/REFERENCES/DOT05F.HTM (last
visited June 9, 2015).

[20] OALJ Law Library, Dictionary of Occupational Titles,
http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/ DOT07B.HTM (last
visited June 9, 2015).

based upon insufficient personal experience and unreliable scholarly literature
. . . were in fact issues for the ALJ to resolve.' " *Gieseke v. Colvin*, 770 F.3d
1186, 1189 (8th Cir. 2014) (quoting *Welsh*, 765 F.3d at 930). Thus, the ALJ
correctly relied on the vocational expert's testimony.

## III.   Whether the ALJ Erred by Failing to Include Evidence in the Record

Symes argues that meaningful review by this court is not possible
because a portion of the administrative record was omitted prior to the
February 2013 ALJ hearing. Docket 11 at 30. The Commissioner moved to
supplement the administrative record with the missing evidence. Docket 13 at
1. Symes objects to the Commissioner's motion on the basis that the
supplemental records constitute new and material evidence, and no good cause
exists for the admission of the supplemental records. Docket 16 at 2. Symes
further argues that his right to due process was violated because he was not
given access to or informed of all evidence that the ALJ relied on in reaching a
decision. *Id.*

### A.   Whether the Omitted Records Are New and Material and Whether Meaningful Review is Possible

42 U.S.C. § 405(g) allows the district court to remand a case "upon a
showing that there is new evidence which is material and that there is good
cause for the failure to incorporate such evidence into the record in a prior
proceeding . . . ." "To be new, evidence must be more than merely cumulative of
other evidence in the record." *Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir.
2012) (citation omitted) (finding that MRI report was not new because, although
report was not included in the record, opinions of doctors who had reviewed

report were part of the record). "To be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Secretary's determination." *Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993); *see Riley v. Shalala*, 18 F.3d 619, 623 (8th Cir. 1994) (finding that reports were cumulative because they would not have changed the decision of the ALJ). Good cause is established "where the condition and associated records did not exist at the time of the hearing." *Mouser v. Astrue*, 545 F.3d 634, 637 (8th Cir. 2008).

Symes argues that the omitted records constitute new and material evidence, and therefore this court must remand under 42 U.S.C. § 405(g) to allow for the proper evaluation of the record. The omitted records are neither new nor material. The missing evidence consists of a medical source statement completed by chiropractor Dr. Nathan Unruh, dated May 15, 2011, a medical source statement concerning Symes's mental health completed by Dr. Melissa Spanggaard, dated May 9, 2011, 15 pages of office treatment records from Southeastern Behavioral HealthCare, dated June 22, 2010, to April 18, 2010, and 8 pages of office treatment records from the Envive chiropractic office, dated May 12, 2010, to April 4, 2011. Like the MRI report in *Perks*, the omitted reports are consistent with other doctors' treatment notes admitted into the record and do not prove the existence of a new condition. *See Perks*, 687 F.3d

40

at 1093. Thus, the omitted reports are not material because they would not likely cause the ALJ to change his determination. *See Woolf*, 3 F.3d at 1215.[21]

Moreover, this court may still engage in meaningful review of the ALJ's decision without considering the omitted records. " 'Where medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation.' " *Miller v. Heckler*, 756 F.2d 679, 680 (8th Cir. 1985) (quoting *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) (finding that remand was required because record contained nothing more than handwritten, largely illegible entries and therefore meaningful review was impossible). By contrast, the Eighth Circuit has found that meaningful review is possible when the ALJ's determinations are supported by substantial evidence on the record as a whole. *See Williams v. Barnhart*, 289 F.3d 556, 557-58 (8th Cir. 2002) (finding that fair review was possible because inaudible testimony was a summary of medical evidence already present in the record); *Andres v. Bowen*, 870 F.2d 453, 455-56 (8th Cir. 1989) (finding that meaningful review was possible even though portion of hearing transcript was missing because ALJ's credibility determinations were

---

[21] The omitted records were cited by an ALJ in the June 2011 proceeding. That ALJ nonetheless found that Symes was not disabled. "Evidence that is offered as proof of a disability, and not found persuasive by an ALJ in a prior proceeding, may be considered in a subsequent proceeding in combination with new evidence for the purpose of determining if the claimant has become disabled since the ALJ's previous decision." *Hillier*, 486 F.3d at 365. But evidence that has already been submitted cannot be reevaluated in a subsequent proceeding. *Id.* Rather, "[such evidence] can only be considered as a background for new and additional evidence of deteriorating mental or physical conditions occurring after the prior proceeding." *Id.* (quoting *Robbins v. Sec'y of Health & Human Servs.*, 895 F.2d 1223, 1224 (8th Cir. 1990)).

41

supported by substantial evidence in the record); *Ward v. Heckler*, 786 F.2d 844, 848 (8th Cir. 1986) (finding that meaningful review was possible even though portions of the testimony were inaudible because the gaps did not interfere with comprehension of the testimony to an extent that would interfere with review process). Like in *Williams* and *Perks*, the omitted records summarized evidence in front of the ALJ. Unlike the illegible record in *Miller*, here the record is largely intact, and any missing records are consistent with the record as a whole. Finally, although the ALJ did not rely on the omitted records, summaries of the omitted records were included in the initial and reconsidered disability determinations. AR 99-100, 129. Thus, consistent with the approach of the Eighth Circuit, meaningful review is possible.

### B.  Whether the Omission of the Records Deprived Symes of His Due Process Right

Symes argues that his right to due process was violated because he was not given access to the omitted records. He alleges that the ALJ indirectly relied on the omitted records in violation of 20 C.F.R. § 404.953(a), which requires that the administrative law judge must base the decision on the preponderance of the evidence offered at the hearing or otherwise included in the record. The Eighth Circuit has explained that "under the Fifth Amendment, procedural due process requires disability claimants to be afforded a full and fair hearing." *Martise v. Astrue*, 641 F.3d 909, 921-22 (8th Cir. 2011) (citing *Hurd v. Astrue*, 621 F.3d 734, 739 (8th Cir. 2010)). " 'Due process is a flexible concept and a determination of what process is due . . . depends upon the particular

42

circumstances involved.' " *Wilburn v. Astrue*, 626 F.3d 999, 1003 (8th Cir. 2010) (quoting *Bliek v. Palmer*, 102 F.3d 1472, 1475 (8th Cir. 1997)). "In order to succeed on a due process claim, [Symes] must prove that he was actually prejudiced by the lack of process afforded to him." *Briones-Sanchez v. Heinauer*, 319 F.3d 324, 327 (8th Cir. 2003); *see Martise*, 641 F.3d at 923 (finding no violation of due process because claimant could not prove prejudice).

Assuming the records were mistakenly omitted, Symes has failed to prove that he was actually prejudiced by the lack of due process afforded to him. *See Martise*, 641 F.3d at 923. The ALJ did not cite or rely on the omitted records. The ALJ did rely in part on the reports of state agency experts Dr. Gunn and Dr. Whittle, who in turn referenced the omitted statements. The ALJ found the state agency physicians' conclusions to be consistent with the record as a whole, and summaries of the omitted statements were present in the record. AR 99-100, 129. Thus, there is no evidence to indicate that the ALJ would have decided differently had the records not been omitted. Accordingly, Symes was not prejudiced by the omission of the records.

## CONCLUSION

Substantial evidence supports the ALJ's conclusion that Symes has not been disabled. Substantial evidence also supports the ALJ's conclusion that Symes can perform light work within certain parameters. And substantial evidence supports the ALJ's determination of Symes's residual functional capacity. Accordingly it is,

ORDERED that the motion to supplement (Docket 13) is granted.

IT IS FURTHER ORDERED that the decision of the Commissioner is affirmed.

Dated July 1, 2015.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE